No. 20-50908

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

TAP PILAM COAHUILTECAN NATION; SAN ANTONIO MISSION CEMETERY
ASSOCIATION; RAYMOND HERNANDEZ,

*Plaintiffs-Appellants,*

v.

DOUGLASS W. MCDONALD, CEO OF THE ALAMO TRUST; GEORGE P. BUSH,
COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS,

*Defendants-Appellees.*

_____

**On Appeal from the United States District Court for the Western District of
Texas
Case No. 5:19-CV-1084**

_____

## BRIEF OF *AMICUS CURIAE* LIPAN APACHE TRIBE OF TEXAS IN
## SUPPORT OF PLAINTIFFS-APPELLANTS

_____

CHRISTOPHER PAGLIARELLA
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 PENNSYLVANIA AVENUE, N.W.
SUITE 400
WASHINGTON, D.C. 20006
TELEPHONE: (203)-305-7528

MORGAN A. PINO
SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
TELEPHONE: (212) 839-5300

DINO L. LAVERGHETTA
*COUNSEL OF RECORD*
CHRISTOPHER D. JOYCE
SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, DC 20005
TELEPHONE: (202) 736-8000
FACSIMILE: (202) 736-8901

*Counsel for* Amicus Curiae

## CERTIFICATE OF INTERESTED PERSONS

### No. 20-50908

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Party Type | Name | Counsel for Party |
|---|---|---|
| **Amicus Curiae** | The Lipan Apache Tribe of Texas | Dino L. LaVerghetta<br>*Attorney of Record for Amicus Curiae*<br>Christopher D. Joyce<br>Morgan A. Pino<br>Sidley Austin LLP<br><br>Christopher Pagliarella<br>Yale Law School<br>Free Exercise Clinic |
| **Plaintiff-Appellant** | Tap Pilam Coahuiltecan Nation | Adrian Anthony Spears, II<br>Art Martinez de Vara<br>Charles H. Sierra<br>The Martinez de Vara Law Firm, PLLC |
| **Plaintiff-Appellant** | San Antonio Mission Cemetery Association | Adrian Anthony Spears, II<br>Art Martinez de Vara<br>Charles H. Sierra<br>The Martinez de Vara Law Firm, PLLC |
| **Plaintiff-Appellant** | Raymond Hernandez | Adrian Anthony Spears, II<br>Art Martinez de Vara<br>Charles H. Sierra<br>The Martinez de Vara Law Firm, PLLC |
| **Defendant-Appellee** | Alamo Trust, Inc. | Manuel Mungia<br>Matthew Edwin Pepping<br>Blake W. Stribling<br>Chasnoff Mungia Valkenaar Pepping & Stribling, P.L.L.C.<br><br>S. Mark Murray<br>Law Office of S. Mark Murray |

| Party Type | Name | Counsel for Party |
|---|---|---|
| **Defendant-Appellee** | Douglass W. McDonald, CEO of the Alamo Trust | Manuel Mungia<br>Matthew Edwin Pepping<br>Blake W. Stribling<br>Chasnoff Mungia Valkenaar Pepping & Stribling, P.L.L.C.<br><br>S. Mark Murray<br>Law Office of S. Mark Murray |
| **Defendant-Appellee** | George P. Bush, Commissioner of the General Land Office of the State of Texas | James Brandon Hughes<br>Donato David Ramos, Jr.<br>Law Offices of Donato D. Ramos, P.L.L.C. |
| **Defendant-Appellee** | Texas General Land Office<br><br>*(Defendant below, served with Notice of Appeal)* | James Brandon Hughes<br>Donato David Ramos, Jr.<br>Law Offices of Donato D. Ramos, P.L.L.C.<br><br>*(Counsel for Defendant in district court proceeding)* |
| **Defendant-Appellee** | Texas Historical Commission<br><br>*(Defendant below, served with Notice of Appeal)* | David G. Gordon<br>Kimberly Fuchs<br>Office of the Attorney General of Texas<br><br>*(Counsel for Defendant in district court proceeding)* |
| **Defendant-Appellee** | City of San Antonio<br><br>*(Defendant below, served with Notice of Appeal)* | Patrick C. Bernal<br>Clarissa M. Rodriguez<br>Denton Navarro Rocha Bernal & Zech<br><br>*(Counsel for Defendant in district court proceeding)* |

Respectfully submitted,

/s/ Dino L. LaVerghetta

Dino L. LaVerghetta
*Attorney of Record for Amicus Curiae, The Lipan Apache Tribe of Texas*

ii

# TABLE OF CONTENTS

Certificate of Interested Persons .......................................................... i

Table of Authorities ...................................................................... iv

Interest of Amicus Curiae .................................................................. 1

Introduction and Summary of Argument ..................................................... 3

Argument ................................................................................. 7

    I.     The District Court Erroneously Applied *Lyng* and Should Have Instead Applied *Smith*, *Lukumi*, and *Brooklyn* ......................... 7

    II.    The Facts Are Sufficient to Maintain a Claim Under *Smith, Lukumi*, and *Brooklyn*. ............................................................ 14

         A.    The Tap Pilam Have Alleged that the Appellees' Regulations Are Not Neutral and Generally Applicable ......................... 14

         B.    The Tap Pilam Have Alleged that the Appellees' Regulations Do Not Survive Strict Scrutiny ............................. 18

Conclusion ............................................................................... 21

Certificate of Service

Certificate of Compliance

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Attakai v. United States,*
746 F. Supp. 1395 (D. Ariz. 1990) ............................................................... 12

*Blackhawk v. Pennsylvania,*
381 F.3d 202 (3d Cir. 2004).......................................................................... 17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993).................................................................................passim

*Cuthair v. Montezuma-Cortez,*
7 F. Supp. 2d 1152 (D. Colo. 1998)................................................................ 7

*Emp't Div., Dep't of Human Res. v. Smith,*
494 U.S. 872 (1990)................................................................................13, 17

*Haight v. Thompson,*
763 F.3d 554 (6th Cir. 2014) ......................................................................... 9

*Holt v. Hobbs,*
574 U.S. 352 (2015)........................................................................................ 9

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
485 U.S. 439 (1988)......................................................................4, 5, 10, 11

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
138 S. Ct. 1719 (2018)................................................................................. 18

*McAllen Grace Brethren Church v. Salazar,*
764 F.3d 465 (5th Cir. 2014) ........................................................2, 8, 9, 13

*McGirt v. Oklahoma,*
140 S. Ct. 2452 (2020).................................................................................. 3

*Navajo Nation v. U.S. Forest Serv.,*
535 F.3d 1058 (9th Cir. 2008) ..................................................................... 11

*Patterson v. Def. POW/MIA Accounting Agency,*
398 F. Supp. 3d 102 (W.D. Tex. 2019)....................................................... 12

*Ramah Navajo Sch. Bd., Inc. v. Sebelius*,
   No. 07 CV 0289 MV, 2013 WL 12303945 (D.N.M. May 9, 2013) ........................... 3

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) .................................................................................5, 13, 15, 16

*Seminole Nation v. United States*,
   316 U.S. 286 (1942) ................................................................................................ 4

*United States v. Sec'y, Fla. Dep't of Corr.*,
   828 F.3d 1341 (11th Cir. 2016) ............................................................................. 20

*Williams v. Annucci*,
   895 F.3d 180 (2d Cir. 2018) .................................................................................. 20

*Yellowbear v. Lampert*,
   741 F.3d 48 (10th Cir. 2014) .................................................................................. 9

**Legislative Material**

S.C.R. No. 61, 86th Leg., Reg. Sess. (Tex. 2019) ............................................................ 1

**Other Authorities**

*Dawn at the Alamo*, The Alamo,
   https://www.thealamo.org/remember/commemoration/dawn-at-
   the-alamo (last visited Mar. 11, 2021) ........................................................... 16

*Group, Private, & After-Hours Tours*, The Alamo,
   http://awscf.thealamo.org/visit/tours/group/index.html (last visited
   Mar. 11, 2021)................................................................................................. 15

## INTEREST OF AMICUS CURIAE[1]

*Amicus*, the Lipan Apache Tribe of Texas (the "Lipan Apache" or "Tribe"), is a state-recognized Native American tribe headquartered in Texas, with its traditional territory spanning the southwestern United States. The Tribe initially settled in the grassy plains of North Texas in the 1600s, but moved south following conflict in the early eighteenth century. In the 1800s, the Lipan Apache supported the Texans in their struggle for independence from Mexico. However, the Tribe faced many challenges in its fight for survival over hundreds of years: the Tribe was scattered, decimated by disease, and forced to either remain on small reservations or be treated as outlaws. In 2009, the Texas Legislature recognized the Lipan Apache Tribe by joint resolutions in both the House and Senate. In 2019, the House, Senate, and Governor of Texas signed concurrent resolutions that both "recognize[d] the Lipan Apache Tribe of Texas and commend[ed] it on its many valuable contributions to this state," and provided an official copy to the Tribe "as an expression of high regard" for the Tribe. S.C.R. No. 61, 86th Leg., Reg. Sess. (Tex. 2019). The Tribe remains without federal recognition.

Members of the Lipan Apache, like most other tribes, continue their struggle to preserve the Tribe's traditional culture, including traditional religious practices. Like the

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a). Undersigned counsel for *amicus curiae* certify that this brief has not been authored in whole or in part by counsel for any of the parties; nor has a party or a party's counsel, or a person other than counsel for *amicus curiae* contributed money to fund preparation and submittal of the brief. Further, Counsel for all parties have advised that they do not oppose the filing of an amicus brief.

Tap Pilam, the Lipan Apache traditionally hold the burial lands of their ancestors to be sacred, and have made efforts to preserve such lands. Members of the Lipan Apache Tribe have ancestral blood ties to the burial site at the Mission San Antonio de Valero, also known as the "Alamo," at issue in this case.

Beyond this immediate case, however, the Tribe has a strong interest in ensuring that the First Amendment Free Exercise rights of Native Americans are not diminished. Pastor Robert Soto, the current Vice Chairman of the Lipan Apache Tribe, was previously engaged in a successful appeal before this Court challenging a federal "policy of limiting permits for the possession of eagle feathers to members of federally recognized tribes" that made no accommodation for traditional religious practices. *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 468 (5th Cir. 2014). Informed by their experience, members of the Lipan Apache Tribe remain engaged in religious liberty issues in the federal courts, including by *amicus* participation when appropriate. *See, e.g.*, Brief of the International Society for Krishna Consciousness, Inc. et al., *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) (No. 19-431), 2020 WL 1391973 (amicus brief for five organizational and individual minority religious representatives, including Pastor Soto).

Having faced persecution for centuries, the Tribe is justifiably concerned with both the religious liberty interests invoked by the Tap Pilam in this case, and the District Court's mistake in treating their claims as barred by law. The District Court's opinion,

if left uncorrected, threatens to give the government carte blanche to prohibit Native Americans from performing religious ceremonies at sacred sites, including the Alamo.

The Lipan Apache have an interest in this Court reversing the lower court's decision on the Free Exercise claim, and requiring that the Tap Pilam's Amended Complaint be evaluated pursuant to the standards set forth in *Church of the Lukumi Babalu Aye* and its progeny, including the recent *Diocese of Brooklyn* decision from the Supreme Court. The *Lukumi* framework is routinely applied by courts to evaluate regulations infringing religious worship. The Tribe seeks to ensure that the religious practices of Native Americans—including the Lipan Apache, the Tap Pilam, and other Native American communities throughout the country—enjoy the same protections as those of non-Native faiths.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The mistreatment of Native Americans is a persistent stain on the fabric of United States history. *Ramah Navajo Sch. Bd., Inc. v. Sebelius*, No. 07 CV 0289 MV, 2013 WL 12303945, at *30 (D.N.M. May 9, 2013) (recognizing "hundreds of years of shameful policies"). Through what the Supreme Court has recently called "the most brazen and longstanding injustices," Native Americans have been robbed of their land, their sovereignty, and their way of life. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2482 (2020) (discussing broken promises with Creek Nation following the Trail of Tears); *see*

3

*also Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942) (discussing federal government obligations to those "Indian tribes" that have been "sometimes exploited"). The District Court's misapplication of Supreme Court precedent now threatens to rob Native Americans of another right at the very core of their way of life: their Constitutional guarantee of the free exercise of religion. The District Court surely did its best to address multiple complex issues in a single opinion. But its resolution of the Free Exercise claim—if adopted in a precedent of this Court—would threaten currently-available Native American religious protections far beyond the circumstances before this Court.

As discussed below, the District Court "d[id] not question" that the Tap Pilam's sincerely held religious beliefs require the performance of both remembrance ceremonies and forgiveness ceremonies at the Alamo. ROA.3489. And, the Court took as true that Appellees' actions, including their access limits and their decisions around the human remains protocol, "prevent[ed] them from performing these ceremonies." ROA.3478-79. Nonetheless, the Court dismissed the Amended Complaint, holding that even if *everything* the Tap Pilam alleged were proved true, all their Free Exercise claims were barred by *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988). ROA.3489-90.

This interpretation of *Lyng* was mistaken. By its own terms, *Lyng* is carefully cabined to circumstances where plaintiffs seek to "require the Government to conduct

its own internal affairs in ways that comport with the[ir] religious beliefs." 485 U.S. at 448 (quoting *Bowen v. Roy*, 476 U.S. 693, 699 (1986)). *Lyng* emphasized, by contrast, that the "Constitution does *not* permit government to discriminate against religions that treat particular physical sites as sacred, and a law prohibiting the Indian respondents from visiting [an] area would raise a *different* set of constitutional questions." *Id.* at 453 (emphases added). It is precisely that scenario and those different questions that are at issue in this case.

Where a person or entity is limited in its *own* religious exercise, the Supreme Court has clearly and repeatedly articulated the correct standard to be applied. As first annunciated in *Employment Division v. Smith* and later clarified in *Church of the Lukumi Babalu Aye* and *Roman Catholic Diocese of Brooklyn*, regulations burdening the free exercise of religion are subject to "strict scrutiny" where they are either "not 'neutral'" or not "of 'general applicability.'" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). Strict scrutiny requires that such burdens be enjoined unless they are "'narrowly tailored' to serve a 'compelling' state interest." *Id.*

Here, the Tap Pilam's First Amended Complaint ("Compl.") alleges sufficient facts that, if proven, would show that the regulations limiting their religious exercise were not neutral and generally applicable. For example, the Tap Pilam allege they were physically prevented from entering the Alamo Chapel to perform a remembrance

ceremony, despite the fact that tourists were allowed to access the Chapel on the same day. Compl. ¶¶ 5, 66, 75. If further factual development indicated that tourists were granted superior access (on that day or otherwise), that would call both neutrality and general applicability into question. The Tap Pilam also state that they were prevented from performing forgiveness ceremonies by exclusion from the Alamo Mission Archaeology Advisory Committee ("AMAAC") and the Alamo Human Remains Protocol, while other faith communities were discretionarily included, and assert that the policy was "craft[ed]" to exclude them. Compl. ¶¶ 1, 6–7, 9, 47, 52. If the protocol policies were in fact an intentional religious gerrymander, or a system of pure individualized discretion, the policies would be neither neutral nor generally applicable. The Court need not prejudge the truth of these claims to recognize the legal standards they would invoke if true.

Further, if proven, the Amended Complaint's allegations would suggest that the regulations are not narrowly tailored to a compelling government interest. The Tap Pilam allege that, from 1995 until 2019, they were allowed "uninterrupted" access to the Alamo Chapel to perform remembrance ceremonies. Compl. ¶¶ 4–5. Moreover, the Tap Pilam allege they have been allowed "to participate" in "human remains protocols" for similar projects, both currently and in the recent past. Compl. ¶¶ 6, 45, 52. If these facts are proven, strict scrutiny requires Appellees to proffer an explanation

as to why they now have a compelling interest in denying access that they allowed for so long.

By applying *Lyng* to factual allegations that *Lyng* expressly distinguished, the District Court avoided having to develop the facts to determine whether strict scrutiny would properly be applied under the *Smith/Lukumi* standard. If the Free Exercise Clause reasoning of the District Court was adopted by this Court, it would effectively hold that Native Americans' religious liberties enjoy lesser protections than those of non-Natives: rendering them again "second-class citizens" who must suffer second-class rights. *Cuthair v. Montezuma-Cortez*, 7 F. Supp. 2d 1152, 1160 (D. Colo. 1998) (discussing "pervasive discrimination" in both law and practice). That is not the law, and this Court should reverse and remand for proper development of the Free Exercise claim.

## ARGUMENT

## I.    The District Court Erroneously Applied *Lyng* and Should Have Instead Applied *Smith*, *Lukumi*, and *Brooklyn*.

Birth and death are milestones of great spiritual significance to all faiths. The Catholic faith, for example, asks parents to baptize their infants within the first few weeks of life and calls for the last rites to be administered shortly before death. In the Jewish faith, a *bris* is held on the eighth day of a boy's life, and family members are required to sit *shiva* for seven days following the burial of a loved-one. Faiths of all kind

mark the entrance of souls into the world and their departure therefrom. The traditions of the Tap Pilam are no different.

In its First Amended Complaint, the Tap Pilam alleged that they were prevented from conducting two types of religious ceremonies over the remains of their ancestors at the Alamo. *First*, the Tap Pilam alleged that Alamo Rangers physically prevented them from entering the Alamo Chapel to perform an annual remembrance ceremony. Compl. ¶ 5. Tribal leaders were under a "solemn vow" to perform that ceremony, which is intended to ensure that their ancestors can continue their journey in the afterlife. Compl. ¶ 3. *Second*, the Tap Pilam were excluded from the AMAAC and the Alamo Human Remains Protocol, which they have alleged prevents them from performing forgiveness ceremonies. Compl. ¶¶ 6–9, 65–66. Such ceremonies are required when remains are reinterred in order to seek forgiveness from ancestors for disturbing their final resting place. Compl. ¶¶ 2–3, 65.

The District Court did not question the sincerity of the Tap Pilam's beliefs nor the fact that Appellee's actions made it impossible for members of the Tap Pilam to fulfill their religious obligations. ROA.3478-79, ROA.3489-90. That should have been sufficient to state a substantial burden on religious practice. As this Court stated in assessing a federal regulation applied to members of the Lipan Apache Tribe, "any scheme that limits [a religious adherent'] access" to property necessary to religious practice puts a "substantial" burden on "the exercise of his religious beliefs." *McAllen*

*Grace Brethren Church*, 764 F.3d at 472 (eagle feather prohibition). That is because "complete bans on religious conduct 'substantially burden [ ] an adherent's free exercise of that religion.'" *Id.* (alteration in original) (quoting *A.A. ex. rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 264 (5th Cir. 2010)). Other courts, including the Supreme Court, have confirmed that outright prohibitions on a practice pose substantial burdens, even where that practice is proposed to take place on government property (such as a prison). *See, e.g., Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (where prisoner shows exercise of religion "grounded in a sincerely held religious belief," enforced prohibition "substantially burdens his religious exercise"); *Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014) (Gorsuch, J.) ("flatly prohibiting Mr. Yellowbear from participating in an activity motivated by a sincerely held religious belief"—access to a Native American sweat lodge—imposes substantial burden); *Haight v. Thompson*, 763 F.3d 554, 564–65 (6th Cir. 2014) (finding in prison context that "[t]he greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)").

Here, the District Court failed to apply the above standard or wrestle with its implications. Instead, it dismissed the Tap Pilam's Free Exercise claims with almost no analysis, broadly stating that "these claims are foreclosed by the Supreme Court's decision in *Lyng*." ROA 3489-90.

*Lyng* is not the correct precedent to be applied in this case. While both this case and *Lyng* involve Native American plaintiffs, the similarities end there. In *Lyng*, the

plaintiffs sought to prevent the government from building a road on federal land based on its impact on the "privacy, silence, and . . . undisturbed natural setting" important to Native American rituals in the area. *Lyng*, 485 U.S. at 442. The Supreme Court held that the building of the road did not violate the plaintiffs' First Amendment rights, even though the road would incidentally interfere with their religious worship. The Court, however, carefully cabined the scope of its opinion to situations like *Lyng* where plaintiffs seek to "require the Government to conduct its own internal affairs in ways that comport with the[ir] religious beliefs . . . ." *Id.* at 448 (internal quotations omitted). It emphasized that, in the case before it, the Government's route was "the farthest removed from contemporary spiritual sites," that "[n]o sites where specific rituals take place [would] be disturbed," and that the complaint was centered on the road's general impact on the plaintiffs' subjective "spiritual development." *Id.* at 451, 454. In other words, *Lyng* stands for the narrow proposition that a subjective impact on a plaintiff's general religious interest in a land, without more, does not "divest the Government of its right to" engage in its own ordinary internal affairs. *Id.* at 453.

*Lyng*, by its own terms, does not foreclose Native Americans—or any other religious believers—from challenging religious discrimination or restrictions on access to sacred land. The Supreme Court expressly held that the opinion did not apply to circumstances where the government coerced plaintiffs into violating their religious beliefs or circumstances where "governmental action penalize[s] religious activity by

denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* at 449. Relevantly, it held that the "Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred," and that this meant "a law prohibiting [Native Americans from visiting an] area would raise a different set of constitutional questions." *Id.* at 453. Put simply, by its own terms, *Lyng* is inapplicable to the Tap Pilam's claims that they were denied access to the Alamo to perform religious ceremonies.

*Lyng*'s application has generally been limited to cases presenting facts analogous to those present in *Lyng* itself, and courts have been careful to stress *Lyng*'s caveats and limitations. For example, in *Navajo Nation*, the Ninth Circuit applied *Lyng* to preclude complaints about the use of artificial snow containing wastewater for ski activities. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063–64 (9th Cir. 2008) (en banc). But the Ninth Circuit emphasized that there would be "no places of worship made inaccessible, or liturgy modified"; that the plaintiffs "continue to have virtually unlimited access to the mountain," and that "the sole effect of the artificial snow is on the Plaintiffs' subjective spiritual experience." *Id.* at 1063. One judge of the Ninth Circuit has recently explained that *Navajo Nation* has nothing to say about the "complete destruction of [an] entire religious site" on government land, and expressed that such an act would clearly "amount to a substantial burden." Order on Motion for Injunction

Pending Appeal, *Apache Stronghold v. United States*, No. 21-15295, slip op. at 10–11 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting) (attached as Exhibit A).[2]

Another example is *Attakai v. United States*, which cited *Lyng* in barring a challenge to certain construction projects, including the installation of fences and livestock watering facilities. 746 F. Supp. 1395, 1403–04 (D. Ariz. 1990). In rendering its opinion, the court went out of its way to emphasize that *Lyng* does not apply to laws forbidding religious access to government land. *Id.* at 1404 ("*Lyng* does recognize the rights of the Indians in certain circumstances to use an area for religious purposes" and does not apply to "law[s] forbidding such access on *government* lands."). However, unlike in the case of the Tap Pilam, "access in terms of the right to physically visit and use [such] sites [was] not an issue" in *Attakai. Id.*[3]

Given that the Tap Pilam's claims are not foreclosed by *Lyng*, the District Court should have evaluated its Free Exercise claims pursuant to the Supreme Court's framework in *Smith* and *Lukumi*—just as any other limitation on access to a religious

---

[2] The panel majority "express[ed] no view on the merits" addressed by Judge Bumatay, denying the injunction on the view that it was "premature." *Id.* at 2.

[3] The District Court invoked a recent district court decision regarding the treatment of (possibly unidentified) remains of servicemembers, but that case held only that "affirmative acts" of government to "recover, disinter, and identify" remains were "not available relief under RFRA." *Patterson v. Def. POW/MIA Accounting Agency*, 398 F. Supp. 3d 102, 122–23 (W.D. Tex. 2019) (providing this as alternative holding to plaintiffs failing to state a clear belief). *Patterson* did not address whether a request to grant access to land or cease a prohibition (such as a prohibition on accessing a gravesite) could form a substantial burden claim.

practice or property would be.[4] *See, e.g.*, *Diocese of Brooklyn*, 141 S. Ct. at 65–67 (reviewing neutrality and general applicability of caps on access to houses of worship); *cf. McAllen Grace Brethren Church*, 764 F.3d at 472 (substantial burden under RFRA).

According to *Smith*, the Free Exercise Clause ordinarily does not prohibit the application of neutral laws of general applicability to religious institutions and practices. *See Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 881–82 (1990). However, where a regulation is not neutral or generally applicable, the most exacting scrutiny must be applied. *Id.* at 884. *See Lukumi*, 508 U.S. at 531–32, 546; *see also id.* at 567–68 (Souter, J., concurring in part and concurring in the judgment). Strict scrutiny requires that regulations infringing religious worship be invalidated unless the government can show that the regulations are "justified by a compelling interest and [are] narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533.

Pursuant to *Smith* and its progeny, the District Court should have evaluated whether the Tap Pilam had alleged facts indicating that the Appellees' regulations denying them access to the Alamo Chapel, the AMAAC, and the Human Remains Protocol were not neutral and generally applicable. If the District Court found that such facts were alleged, the case would have proceeded to an analysis of whether the

---

[4] In their motions to dismiss, Appellees themselves implicitly acknowledged that *Smith* would require their actions to be subjected to strict scrutiny if they were found to be not neutral or generally applicable. Defendant George P. Bush, Motion to Dismiss at 7-8; Defendant Douglass W. McDonald, Motion to Dismiss at 18.

Appellees' regulations were not narrowly tailored to advance a compelling government interest. Because the District Court failed to conduct either of these analyses, this Court should reverse and remand for these missing factual analyses.

## II.    The Facts Are Sufficient to Maintain a Claim Under *Smith*, *Lukumi*, and *Brooklyn*.

If this Court wishes to give further guidance on remand, it could note that if the District Court had conducted the proper constitutional analysis, it would have determined that the Tap Pilam have stated a claim for a violation of its First Amendment rights deserving further factual development. *First*, the Amended Complaint alleges facts indicating that the Appellees' regulations are not neutral and generally applicable, either by individualized consideration or by treating substantially similar conduct in disparate ways. *Second*, the Amended Complaint alleged facts tending to show that the Appellees' regulations deny previously granted access, suggesting the regulations are not narrowly tailored and cannot survive strict scrutiny. Reversal and remand to allow the District Court to assess these claims in the first instance would be appropriate.

### A.    The Tap Pilam Have Alleged that the Appellees' Regulations Are Not Neutral and Generally Applicable.

The Supreme Court has held that regulations are not neutral or generally applicable where they "discriminate[] against some or all religious beliefs." *Lukumi*, 508 U.S. at 532. A common way that regulations can lack neutrality and general applicability

is where they treat religious conduct less favorably than analogous conduct, secular or spiritual. *See Diocese of Brooklyn*, 141 S. Ct. at 66 (invalidating COVID-related restrictions that treated houses of worship less favorably than garages, campgrounds, and acupuncture facilities); *Lukumi*, 508 U.S. at 532–33 (citing, *e.g.*, *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953) (municipal ordinance was applied in an unconstitutional manner when interpreted to prohibit preaching in a public park by a Jehovah's Witness while permitting preaching during Catholic mass or Protestant service)). Regulations may also lack general applicability where a system of "individualized exemptions" are at issue. *Id* at 537.

In order to assess neutrality and general applicability, a court must "survey meticulously" the evidence, *id.* at 534, "both direct and circumstantial," *id.* at 540 (opinion of Kennedy, J.). Here, the Amended Complaint alleges that, on the morning of September 7, 2019, government agents forcibly prevented the Tap Pilam from entering the Alamo Chapel to perform its annual sunrise remembrance ceremony, despite allowing tourists access to the Chapel on the same day. Compl. ¶ 5. Information on the Alamo's public website suggests that there is ordinarily allowance for tourists to access after-hours and before-hours tours, including for "private ceremonies," requiring only a small fee for groups to access the Chapel and the museum.[5] The Alamo also

---

[5] *Group, Private, & After-Hours Tours*, The Alamo, http://awscf.thealamo.org/visit/tours/group/index.html (last visited Mar. 11, 2021).

grants free admission to an annual "Dawn at the Alamo" commemorative ceremony that takes place before operating hours on the Alamo grounds.[6] This ceremony is a major secular event that is intended to "honor the sacrifice of the Alamo Defenders" with "readings, vignettes, music, wreath-laying, and a musket volley." *Id.* To the extent that the Tap Pilam have alleged their *religious* ceremony which honors and remembers the interred ancestors of its members was denied equal treatment with secular activities such as the above, that would make out a claim that Appellees singled out religious worship for "especially harsh treatment." *Diocese of Brooklyn*, 141 S. Ct. at 66. Under such an allegation, the Tap Pilam should be permitted to factually develop their claim that the actions are not neutral and generally applicable.

The Amended Complaint also alleges that the Tap Pilam were excluded from the AMAAC, the committee tasked with handling remains unearthed at the Alamo, thereby excluding them from the plan for the handling of disinterred remains (what the Tap Pilam refer to as the "Human Remains Protocol"). The Tap Pilam allege (and the District Court accepted at this stage of the case) that this exclusion results in preventing them from being able to perform required religious ceremonies for their ancestors' disinterred remains, including forgiveness ceremonies and other funerary rituals. Compl. ¶¶ 3–5, 65–66, 75–76. Moreover, the Tap Pilam allege that Appellees made

---

[6] *Dawn at the Alamo*, The Alamo, https://www.thealamo.org/remember/commemoration/dawn-at-the-alamo (last visited Mar. 11, 2021).

discretionary choices as to which Native communities to include in this committee and protocol, favoring those without the Tap Pilam's beliefs. Compl. ¶¶ 6–7, 9. If Appellees indeed chose to treat certain traditional faith communities more favorably than the Tap Pilam based on their beliefs, the Appellees' actions would not be neutral. *See Lukumi*, 508 U.S. at 532–33 *Smith*, 494 U.S. at 877.

Even if such motivation on the basis of belief had not been alleged, purely discretionary, individualized assessments do not qualify as "generally applicable" laws, and do not benefit from the *Smith* carve-out to strict scrutiny. "[A] law must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (Alito, J.). The Tap Pilam's complaint expressly alleges that the committee and protocol were formed in a "voluntary selective" manner akin to a system of "individualized exemptions." Compl. ¶ 52, 73; *see* Compl. ¶ 80 (alleging, for different claim, "unbridled discretion"). That is enough to make out a claim that the regulation "permits individualized, discretionary exemptions" and is therefore not generally applicable. *Blackhawk*, 381 F.3d at 209.

The Appellees' response that they excluded the Tap Pilam from the AMAAC based on political classifications—rather than on racial or religious grounds—does not alter this conclusion at the motion to dismiss stage. Defendant George P. Bush, Motion

to Dismiss at 12; Defendant Douglass W. McDonald, Motion to Dismiss at 11. First, that would not alter the individualized nature of the decision making. But second, the Tap Pilam allege that the Appellees' decision to only allow certain tribes to participate in the AMAAC was driven by the specific intent to exclude the Tap Pilam—allegedly to "rush the project through without distractions" from those who would be required by their faith to perform funerary rituals for their ancestors. Compl. ¶¶ 6–9, 49, 52, 61, 63. In other words, the Amended Complaint alleges that Appellees crafted a system designed to target religious worship for exclusion. Appellees may strenuously contest this claim. However, if the factual allegations are proven, the regulations would operate as an impermissible "religious gerrymander[ ]" that "attempt[s] to target [the Tap Pilam] and their religious practices," rendering those regulations not neutral. *Lukumi*, 508 U.S. at 535; *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (factors relevant to the assessment of neutrality include "the specific series of events leading to the enactment or official policy in question"). Taking all well-pleaded facts as true, as must be done at the motion to dismiss stage, dismissal would not be appropriate.

### B.     The Tap Pilam Have Alleged that the Appellees' Regulations Do Not Survive Strict Scrutiny.

Because the Appellees' regulations are not neutral and generally applicable, those regulations must be invalidated unless Appellees can show that they are narrowly tailored to achieve a compelling government interest. *See Lukumi*, 508 U.S. at 533. While

premature to finally decide, the Complaint suggests it is unlikely that the Appellees can identify a compelling interest for their disparate treatment of the Tap Pilam, much less make a showing that their regulations are narrowly tailored to achieve such an interest.

The Appellees cannot show that they have a compelling interest in prohibiting the Tap Pilam from conducting sunrise remembrance ceremonies if they allow after-hours secular access for tourist activities and celebrations, or other types of access implicating the same interests. *See supra* Section II.A. The Supreme Court directly addressed this issue in *Lukumi*:

> Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling. It is established in our strict scrutiny jurisprudence that "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."

508 U.S. at 533 (quoting *The Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J. concurring in part and concurring in judgment)). Certainly, Appellees could not identify a compelling interest that is harmed by after-hours religious access to the Chapel but *not* harmed by after-hours secular access.

The historical Chapel access granted to the Tap Pilam further undermines any claim of a compelling interest. The Amended Complaint alleges that, from 1995 until 2019, the Tap Pilam were allowed uninterrupted access to the Alamo Chapel to perform remembrance ceremonies. Compl. ¶¶ 4–5. Strict scrutiny requires Appellees to proffer

an explanation as to why they now have a compelling interest in denying access that they allowed for so long. *See, e.g.*, *Williams v. Annucci*, 895 F.3d 180, 192 n.5 (2d Cir. 2018) (in prison context, noting that "where a facility has demonstrated a capability" to accommodate a religious practice, "we are well within bounds to consider that capability when determining how burdensome accommodat[ion] . . . would actually be"); *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341, 1347–48 (11th Cir. 2016) ("The Secretary also fails to explain how she has a compelling governmental interest in not providing kosher meals to inmates now even though she voluntarily provided them in 2013.").

The facts also suggest that Appellees cannot identify a compelling interest in excluding the Tap Pilam from the AMAAC and Human Remains Protocol, while simultaneously allowing tribes with little or no ties to the Alamo to participate. The Amended Complaint alleges that the Tap Pilam have been allowed to participate in human remains protocols for similar projects, both currently and in the recent past. Compl. ¶¶ 6, 45, 53 (including, for example, the Maverick Plaza/La Villita Project). Strict scrutiny requires Appellees to identify a unique interest in excluding the Tap Pilam from the Alamo Project that is not implicated by the Tap Pilam's participation in the other projects. Dismissal would be inappropriate before such an interest is invoked and assessed by any court.

## CONCLUSION

The District Court failed to evaluate the Tap Pilam's Free Exercise claims using the standards required by the Supreme Court decisions in *Smith*, *Lukumi*, and *Brooklyn*. If the District Court had applied the framework required by that precedent, it would have concluded that the Amended Complaint states a claim for a violation of the Tap Pilam's First Amendment rights, and allowed the case to proceed to factual development. Accordingly, the judgment of the District Court should be reversed.

Dated: March 12, 2021

Christopher Pagliarella
Yale Law School
Free Exercise Clinic
1919 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20006
Telephone: (203)-305-7528

Morgan A. Pino
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300

Respectfully submitted,

*/s/ Dino L. LaVerghetta*
Dino L. LaVerghetta
*Counsel of Record*
Christopher D. Joyce
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8901

*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2021, an electronic copy of the foregoing BRIEF OF AMICUS CURIAE LIPAN APACHE TRIBE OF TEXAS IN SUPPORT OF PLAINTIFFS-APPELLANTS was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service on all parties will be accomplished by the appellate CM/ECF system.


/s/ Dino L. LaVerghetta

Dino L. LaVerghetta
*Attorney of Record for Amicus Curiae, The Lipan Apache Tribe of Texas*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief:

(i) complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, this brief contains 5,180 words; and

(ii) complies with Fed. R. App. P. 29(a)(4), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Garamond.

Dated: March 12, 2021                    /s/ Dino L. LaVerghetta

Dino L. LaVerghetta
*Attorney of Record for Amicus Curiae, The Lipan
Apache Tribe of Texas*

# EXHIBIT A

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 5 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| APACHE STRONGHOLD, a 501(c)(3) nonprofit organization, | No. 21-15295 |
| Plaintiff-Appellant, | D.C. No. 2:21-cv-00050-SPL District of Arizona, Phoenix |
| v. | |
| UNITED STATES OF AMERICA; et al., | ORDER |
| Defendants-Appellees. | |

Before: M. SMITH, BADE, and BUMATAY, Circuit Judges.

Order by Judges M. SMITH and BADE, Dissent by Judge BUMATAY.

Appellant's emergency motion for an injunction pending appeal (Docket

Entry No. 6) is denied without prejudice. *See* 9th Cir. R. 27-3; *see also Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Government has averred

that USFS "will not proceed to convey any right, title, and/or interest of the United

States in and to the Federal land, as defined in the Act, to Resolution Copper" until

after publication of a new FEIS, which will take "months." The Government has

also stated, under penalty of perjury, that USFS "will provide 30-days advance

notice" to Apache Stronghold prior to the publication of a new FEIS. These

representations mean that Apache Stronghold has not shown that it "needs relief

within 21 days to avoid irreparable harm" pursuant to its request for an emergency

stay.  9th Cir. R. 27-3.  An examination of the merits of Apache Stronghold's request for a preliminary injunction—denied by the district court and currently pending on appeal—is therefore premature.  We express no view on the merits.

The previously established briefing schedule remains in effect.

BUMATAY, Circuit Judge, dissenting:

For a great many people, religious and spiritual tradition is among their most precious inheritances.  The Western Apaches are no different.  For hundreds of years, they have worshipped at a location in Arizona's Tonto National Forest believed to be the most sacred of grounds—Oak Flat.  According to their religious tradition, Oak Flat serves as the dwelling place of the Creator's messengers to the earth and generates a direct connection between the Creator's spirit and the Western Apache peoples.  Given the deep bond between the Creator and the natural resources of the land, the Western Apaches regard Oak Flat as the holiest land—the perennial home of their sacred religious ceremonies and a historic place of worship.  For them, the grounds, plants, and waters of Oak Flat are imbued with unique spiritual significance.  It is no overestimation to say that Oak Flat is the spiritual lifeblood of the Western Apache peoples, connecting them to the Creator since before the founding of the Nation.

Despite this sacred history, the Government seeks to convey Oak Flat to a private mining venture—Resolution Copper.  By the Government's own assessment, Resolution Copper's plans will destroy Oak Flat—constructing a mine underneath it and literally turning it into a crater.  The devastation will be "immediate, permanent, and large in scale."  2 Final Environmental Impact Statement ("FEIS") at 789.[1]  And

---

[1] Available at https://www.resolutionmineeis.us/.

21-15295

it will cause "indescribable hardship" to the Western Apaches.  1 FEIS at ES-29.
"Mitigation measures cannot replace or replicate the tribal resources and traditional
cultural properties that would be destroyed[.]"  3 FEIS at 856.

Thus, notwithstanding any economic or other benefit that mining would bring
to the area, federal law requires the strictest of scrutiny here: under the Religious
Freedom Restoration Act ("RFRA"), Congress has commanded in no uncertain
terms that the government may not substantially burden religious exercise but for a
compelling reason and with the narrowest of means.  *See* 42 U.S.C. § 2000bb-1(a).

Apache Stronghold comes to this court seeking a pause on the transfer of Oak
Flat to ensure that the Western Apaches' religious liberty is protected.  Under RFRA,
Apache Stronghold is entitled to that pause.  Transferring Oak Flat to a private
venture will result in restricted access to the religious site, strip the Western Apaches
of certain legal protections, and eventually lead to the complete destruction of the
land.  This is an obvious substantial burden on their religious exercise, and one that
the Government has not attempted to justify.  And the Government's eleventh-hour
promises of delay and consultation with the Western Apaches are not enough to allay
the threat of irreparable harm.  The law affords the Western Apaches more than
promises.

For these reasons, I respectfully dissent from the denial of injunctive relief
pending appeal.

## I.

Oak Flat is situated on a 2,422-acre parcel of land in Arizona.  Section 3003 of the National Defense Authorization Act of 2015 authorizes the Government to transfer the land to Resolution Copper, a joint venture of two foreign mining companies.  P.L. 113-291, <u>128 Stat. 3292</u>, <u>3732</u>, § 3003(c) (2014); <u>16 U.S.C. § 539p</u> <u>(the</u> "Act").  As a prerequisite to conveying the land, the Government is obligated to publish a "single environmental impact statement."  <u>16 U.S.C. § 539p(c)(9)(B)</u>. "Not later than 60 days after" the publication of that statement, the Government is legally obligated to convey the land to Resolution Copper.  *Id.* § 539p(c)(10).

In December 2020, the Department of Agriculture announced that the FEIS required by the Act would be published in January 2021.  The Department subsequently published that FEIS on January 15, 2021.  Under the law, this initiates a 60-day period to convey the land to Resolution Copper, which would end on March 16, 2021.  *See id.*  The Government was poised to effectuate the transfer on March 11, 2021.

Apache Stronghold, a nonprofit organization seeking to prevent the destruction of Apache holy lands, sought an injunction to prevent the land exchange. After the request was denied, Apache Stronghold applied to this court for an emergency injunction pending appeal.  Just hours before its opposition was due in this court, the Government directed the Forest Service to rescind the FEIS.  Gov't

Opp'n Br. at 1. Now, instead of March 11, 2021, the Government asserts that the date of the pending transfer is unknown. But it assures us that the transfer is "likely" not imminent. *Id.* at 7. A Forest Service employee also commits to providing Apache Stronghold 30 days' advance notice for reinstatement of the FEIS. Gov't 28(j) Ltr. Even if the transfer were imminent, the Government asserts, the Western Apaches would enjoy continued access to Oak Flat *Campground* "to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper." 16 U.S.C. § 539p(i)(3). The Oak Flat Campground, not to be confused with Oak Flat, is "approximately 50 acres of land comprising approximately 16 developed campsites." *Id.* § 539p(b)(5).

## II.

A plaintiff seeking a preliminary injunction is ordinarily required to show "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest[.]" *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (simplified).

Our circuit applies a sliding scale approach to preliminary injunctions, meaning that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for*

*the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Likelihood of success on the merits is the most important preliminary injunction factor. *Doe #1 v. Trump*, 984 F.3d 848, 861 (9th Cir. 2020). Where the Government is a party to the case, as here, the third and fourth factors merge. *Id.*

Under these factors, Apache Stronghold is entitled to a preliminary injunction.

## A.

Apache Stronghold has established a strong likelihood of success on the merits. Congress enacted RFRA "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). Concerned that "neutral" laws might nonetheless inhibit religious exercise, Congress commanded that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability[.]" 42 U.S.C. § 2000bb-1(a). The only exception is when the government can demonstrate that the burden "is in furtherance of a compelling governmental interest" and that it has chosen "the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b)(1)–(2). Thus, when the government substantially burdens the exercise of religion, it may only do so by demonstrating a compelling interest and narrow tailoring. *Id.*

"Religious exercise" as defined in RFRA means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief. *Id.* § 2000cc-

5(7)(A); *see id.* § 2000bb-2(4). And although not statutorily defined, we have held that a burden is substantial when it is "considerable in quantity or significantly great." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (simplified). Together, then, the government substantially burdens religious exercise when it places a "significantly great restriction or onus on any exercise of religion, whether or not compelled by, or central to, a system of religious belief of a person." *Id.* at 1035 (simplified). In this way, RFRA "provides a level of protection to religious exercise beyond that which the First Amendment requires." *Guam v. Guerrero*, 290 F.3d 1210, 1218 (9th Cir. 2002); *see also Burwell*, 573 U.S. at 714.

Under RFRA, as then-Judge Gorsuch wrote, a substantial burden exists when the government "prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).[2] It also exists when the government "exert[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (simplified). Further, we have acknowledged that "a place of worship . . . is at the very core of

---

[2] True enough, it was the Religious Land Use and Institutionalized Persons Act ("RLUIPA") at issue in *Yellowbear*. No matter—RLUIPA mirrors RFRA's "substantial burden" language and, thus, uses the "same standard." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).

the free exercise of religion." *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011) (simplified).

With that in mind, this is not a difficult case. For the Western Apaches, Oak Flat is sacred land—it is a "buffer between heaven and earth" and the dwelling place of the Creator's "messengers." Oak Flat is thus a conduit to the transcendent, and as a result, certain religious ceremonies of the Western Apaches *must* take place there. These practices include the gathering of sacred plants, animals, and minerals for use in ceremony, as well as prayers, songs, and the use of "the sacred spring waters that flow[] from the earth with healing powers not present elsewhere."

Resolution Copper's mining activities won't just temporarily exclude the Western Apaches from Oak Flat, or merely interrupt the worship conducted there. Instead, Resolution Copper will turn Oak Flat into a crater approximately 2 miles across and 1,100 feet deep. 1 FEIS at 10. The Western Apaches' exercise of religion at Oak Flat will not be burdened—it will be obliterated. Simply, the conveyance of the land will render the core religious practices of the Western Apaches' impossible and their primary method of experiencing the divine nonexistent. Everything about Oak Flat will be erased: sacred sites used for various religious ceremonies, trees and plants used in sacred medicine, sacred springs with healing powers, burial grounds, and ancient artifacts.

Worse yet, the Government has not even attempted to justify Oak Flat's annihilation by arguing that it is narrowly tailored to serve a compelling government interest—neither in the district court nor before this court. Amazingly, it instead argues that Resolution Copper's plans will not amount to a substantial burden on the religious exercise of the Western Apaches at all. As just explained, that's wrong.

Our decision in *Navajo Nation v. U.S. Forest Service*, <u>535 F.3d 1058</u> (9th Cir. 2008) (en banc), does not require a different result. In that case, the plaintiff Indian Tribes objected under RFRA to the use of recycled wastewater to make artificial snow on "the Snowbowl" in Arizona, a federally owned, public-recreation facility. *Id.* at 1064–65. The Indian Tribes had long used the mountains around the Snowbowl for religious ceremonies. *Id.* at 1064. Thus, they argued that the use of the artificial snow made from recycled wastewater substantially burdened their religious exercise because it "spiritually contaminate[d] the entire mountain and devalue[d]" their religious experience. *Id.* at 1063.

Rejecting the RFRA claim, we emphasized that "the Forest Service ha[d] guaranteed that religious practitioners would still have access to the Snowbowl and the rest of the Peaks for religious purposes." *Id.* at 1070 (simplified). The "only effect" of the use of recycled wastewater was on the Indian Tribes' "subjective,

emotional religious experience." *Id.*[3]  Indeed, the district court found that "no plants, springs, natural resources, shrines with religious significance, or religious ceremonies . . . would be physically affected" by the artificial snow.  It further concluded that the Indian Tribes would "continue to have virtually unlimited access to the mountain, including the ski area, for religious and cultural purposes," including "to pray, conduct their religious ceremonies, and collect plants for religious use."  *Id.* at 1063.  *Navajo Nation* did not reach the issue here—whether the total devastation of a religious site substantially burdens religious exercise.  As the dissent noted, "a court would surely hold that the Forest Service had imposed a 'substantial burden' on the Indians' 'exercise of religion' if it paved over the entirety of [the religious] Peaks."  *Id*. at 1090 (Fletcher, J., dissenting).

Our holding in *Navajo Nation* is thus of little help here, where the religious burden in controversy is not mere interference with "subjective" experience, but the undisputed, complete destruction of the entire religious site.  By the government's own estimation, this destruction will be permanent and irreversible.  2 FEIS at 789–90.  And much before that, the Western Apaches will necessarily be physically excluded from Oak Flat, rendering their core religious practices impossible.

---

[3] While I would not characterize religious belief and experience as merely "subjective" and "emotional," *see Navajo Nation*, 535 F.3d at 1096 (Fletcher, J., dissenting) (explaining that "the majority misunderstands the nature of religious belief and practice"), this point is nonetheless important to understand the difference between *Navajo Nation* and the present case.

Consequently, Apache Stronghold has shown a high likelihood of success on the merits: the conveyance of Oak Flat to Resolution Copper will substantially burden the religious exercise of the Western Apaches, with no purported compelling justification.[4]

## B.

Apache Stronghold has also shown that the Western Apaches are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. We have held that irreparable harm is "relatively easy to establish" in the context of the First Amendment. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). A plaintiff can establish irreparable harm by "demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002) (simplified), *abrogated on other grounds by Winter*, 555 U.S. at 22. That is because "[t]he loss of First Amendment

---

[4] In addition to RFRA, I have serious doubts that the Act would pass constitutional muster under our Free Exercise Clause precedent: it is not neutral or generally applicable because it specifically targets the land on which Oak Flat lies. It therefore must satisfy strict scrutiny. *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). As just explained, the Government has not done so.

The Free Exercise Clause "defines nothing less than the respective relationships in our constitutional democracy of the individual to government and to God." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 577 (1993) (Souter, J., concurring in part and concurring in the judgment). Accordingly, it is an issue of surpassing importance. But because RFRA alone is sufficient ground to grant relief, I would not reach the Free Exercise claim here.

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

It is clear from the record that, absent an injunction, Apache Stronghold faces a strong likelihood of imminent, irreparable harm. The Government published the FEIS on January 15, 2021. Under the Act, the Government is required to transfer Oak Flat to Resolution Copper "[no] later than 60 days after the date of publication." 16 U.S.C. § 539p(c)(10). That would mean that the Government must transfer to the land by March 16, at the latest.

Once the land is transferred, the Western Apaches will suffer immediate, irreparable harm. First, their First Amendment rights would be burdened by the certain destruction of their religious site. The Government acknowledged that the mining activity planned by Resolution Copper would cause "immediate, permanent, and large . . . scale" destruction of "archeological sites, tribal sites, [and] cultural landscapes." 2 FEIS at 789. And although the Government contends that "any subsidence-causing mining activities are still years in the future," Gov't Opp'n Br. at 8, Resolution Copper will undoubtedly engage in preparatory activities that are likely to degrade the Oak Flat environment. This includes constructing "new shafts," "new roads," a "water treatment plant," an "admin building," and "substations." 1 FEIS 57, Fig. 2.2.2-3. Any of these construction activities may cause irreparable

damage to the Oak Flat, even if the site won't be entirely cratered immediately after conveyance.

Second, the conveyance will result in the Western Apaches being effectively excluded from the Oak Flat site. The Government claims that access to the site will be maintained after the land exchange. Gov't Opp'n Br. at 8. But in a declaration submitted by the Government, Resolution Copper promises only that the venture "will provide access to the surface of the Oak Flat Campground," not Oak Flat in its entirety.[5] The Campground, meanwhile, consists of only "50 acres of land comprising approximately 16 developed campsites." 16 U.S.C. § 539p(b)(5). And even this narrow pledge is accompanied by a wide qualification: Resolution Copper will provide the Western Apaches access only "to the extent practicable and consistent with health and safety requirements." But according to the Act, Resolution Copper "determine[s]" whether access is "practicable" and "consistent with health and safety requirements." *Id.* § 539p(i)(3). The Western Apaches would therefore be dependent on the good grace of a private copper-mining venture for any access to their sacred religious site—that is, until the mining companies eviscerate

---

[5] *See also* 1 FEIS at 314 ("The land exchange would have significant effects on transportation and access. The Oak Flat Federal Parcel would leave Forest Service jurisdiction, and with it public access would be lost to the parcel itself . . . Resolution Copper *may* keep portions of the property open for public access, *as feasible*.") (emphasis added).

the site altogether.  On closer scrutiny, this guarantee of access appears to be a hollow promise.

Third, once the land leaves the Government's hands, the Western Apaches likely cannot bring a RFRA or Free Exercise claim against Resolution Copper should the venture burden or extinguish their ability to worship or access Oak Flat.  *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999) ("RFRA does not expressly include private employers within its reach."); *Hall v. Am. Nat'l Red Cross*, 86 F.3d 919, 921 (9th Cir. 1996) ("[P]rivate entities are considered government actors under the First Amendment [only] if they have a sufficient structural or functional nexus to the government.").

The Government absurdly asserts that we needn't worry about any of these concerns because the transfer can be reversed if it turns out that the Western Apaches' free exercise rights are being violated.  Gov't Opp'n Br. at 10.  Appeals can take months, even years.  By then, who knows what will have happened to the land?  It may be rendered unfit for religious worship, making reversal of the transfer futile.  Moreover, a court considering this remedy will also need to balance Resolution Copper's reliance interests in developing the land.  Ultimately, whether to rescind a completed land transfer is a matter of judicial discretion.  *See Kettle Range Conservation Grp. v. BLM*, 150 F.3d 1083, 1087 (9th Cir. 1998) (declining to rescind land transfer where the land had already been "denuded" and it would "be

impractical to attempt to unscramble the eggs"). While the law guarantees Apache Stronghold its rights, all the Government can offer is hope.

Furthermore, the Government's decision to rescind the FEIS only hours before its opposition brief was due does not defeat Apache Stronghold's showing of irreparable harm. While the Government previously told the district court that it will convey the land on March 11, 2021, we now have an assurance that it will "likely" not convey the land imminently, Gov't Opp'n Br. at 7, and a promise from a Forest Service employee that the agency will give Apache Stronghold 30 days' notice before republication of the FEIS. Gov't 28(j) Ltr.

I take the Government's word at face-value, but it doesn't guarantee that Oak Flat won't be transferred during this appeal. The Government cannot even guarantee that the conveyance of the land won't occur imminently. At the very least, and most significantly for me, the Government has not identified any *legal impediment* to reinstating the FEIS and conveying the land at any time.[6] At best, the Government

---

[6] To be sure, government regulation requires 30 days' notice before publication of a final environmental impact statement. 40 C.F.R. § 1506.11(b)(2). But the government has already provided that notice. The plain text of the regulation doesn't require a new notice if a final environmental impact statement is published, withdrawn, and then reinstated. Moreover, the regulation also allows for that shortening of the notice period for "compelling reasons." *Id*. § 1506.11(e). Thus, nothing in the words of the regulation bars the Government from reissuing the FEIS at any given time. Most importantly, the Government has never conceded that it is barred from reissuing the FEIS without providing the notice required by § 1506.11(b)(2).

maintains discretion to re-issue the FEIS and immediately thereafter transfer the land to Resolution Copper.  And as its eleventh-hour decision to rescind the FEIS amply demonstrates, the Government is nimble enough to adjust their timelines at a moment's notice.

Any uncertainty surrounding the immediacy of the harm was introduced by the Government's last-minute maneuvering.  It's noteworthy that the Government made the decision to finalize and issue the FEIS on January 15, opposed Apache Stronghold's motions for injunctive relief for almost two months, opposed an agreement with Apache Stronghold to pause the transfer for 60 days, and then scheduled the land transfer for March 11—only to rescind the FEIS just six hours before its opposition brief was due to this court and then claim that there's no longer threat of irreparable harm.  The Supreme Court recently suggested we do not acquiesce to such tactics.  *See Cuomo*, 141 S. Ct. at 67 (finding irreparable harm notwithstanding government's assurance that it would not enforce violative restrictions).

_____

Further, Apache Stronghold has expressed concern that, because the FEIS has already been published, the 60-day deadline to convey land was triggered and the transfer must occur by March 16, 2021—notwithstanding the last minute recission.  Indeed, while the Act does not provide for the withdrawal and reissuance of a FEIS, it makes very clear that the Government "shall convey" Oak Flat within 60 days of the FEIS's "date of publication."  *See* 16 U.S.C. § 539p(c)(10).  It is unclear what the Government's withdrawal of the FEIS means for this obligation. This uncertainty counsels strongly in favor of staying the matter while these issues are worked out on appeal.

We are asked to trust the Government that, left to its own devices, it will not transfer the land to Resolution Copper in the near future. Faced with such a substantial harm to the Western Apaches' free exercise rights, we should require more than the Government's say-so.

## C.

The balance of the equities and the public interest also "tip[] sharply" in Apache Stronghold's favor. *Cottrell*, 632 F.3d at 1131 (simplified). Not only would the harm to Apache Stronghold be irreparable, imminent, and of constitutional significance in the absence of an injunction, but on this record an injunction would create few costs for the Government. While courts should never take enjoining the Government lightly, the abstract harm of restraining the Government is "not dispositive of the balance of harms analysis." *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (simplified). Indeed, the Government has withdrawn the FEIS and pledged to re-initiate consultation. According to the Government, the transfer is "likely" not imminent. Govt. Opp'n Br. at 7. An injunction during the pendency of this appeal would therefore not disrupt the Government's plans. As Justice Kavanaugh recently noted in the context of government restrictions on places of worship during COVID-19:

> There also is no good reason to delay issuance of the injunctions, as I see it. If no houses of worship end up in [restrictive] zones, then the Court's injunctions today will impose no harm on the State and have no effect on the State's response to COVID–19. And if houses of worship

21-15295

> end up in [restrictive] zones, as is likely, then today's injunctions will ensure that religious organizations are not subjected to the unconstitutional 10-person and 25-person caps. Moreover, issuing the injunctions now rather than a few days from now not only will ensure that the applicants' constitutional rights are protected, but also will provide some needed clarity for the State and religious organizations.

*Cuomo*, 141 S. Ct. at 74 (Kavanaugh, J., concurring).

Similar concerns counsel in favor of an injunction here. While the Government gives assurances that nothing will "likely" happen soon, the Western Apaches are spared the transfer and eventual destruction of their most sacred site only by the grace of the Government. They are entitled to more clarity. Indeed, "all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (simplified). This is particularly so where religious rights are at issue, because "[p]rotecting religious liberty and conscience is obviously in the public interest." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). Accordingly, the harm to Apache Stronghold far outweighs any harm to the Government.

### III.

Our Constitution and laws have made the protection of religious liberty fundamental. Apache Stronghold has clearly established that the religious exercise of the Western Apaches will be substantially burdened by the Government's actions here. And the preliminary injunction factors weigh sharply in favor of hitting pause on this case while the parties pursue this appeal. Regrettably, instead of legal

protection and certainty, today's order will provide Apache Stronghold with only ambiguity, while Oak Flat remains at the mercy of the Government.

I respectfully dissent from the denial of injunctive relief.